**In re CRYSTAL S. and Angela S.**

Supreme Judicial Court of Maine.

Argued Sept. 21, 1984.

Decided Oct. 31, 1984.

Broaddus & Ferrucci, David J. Ferrucci (orally), Westbrook, for plaintiff.

Thomas E. Geyer, Dept. of Human Services (orally), Augusta, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

NICHOLS, Justice.

Brenda S., the mother of Crystal S. and Angela S., appeals from a judgment of the Superior Court (Cumberland County) affirming an order of the District Court (Portland) that terminated her parental rights pursuant to 22 M.R.S.A. § 4055 (Supp.1983–1984). On this appeal she contends, first, that the Department of Human Services failed to fulfill its statutory obligation to facilitate reunification of the family prior to seeking termination of parental rights and, second, that the evidence is insufficient to establish the grounds for termination. Third, she challenges the constitutional adequacy of the standard of proof by clear and convincing evidence as it was defined in our opinion in *Horner v. Flynn,* 334 A.2d 194, 199 (Me.1975).

We conclude that a failure to facilitate reunification does not mandate denial of a petition for termination; that the standard of proof is constitutionally valid; and that it was adequately met on the facts of this case. Therefore, we deny the appeal.

A review of the record before the District Court reveals the following facts relevant to this appeal: Twice in the period

from August, 1973 to August, 1974, Crystal S. (born September 23, 1972) was placed in foster care by the Department of Human Services (the Department) at her mother's request. In August, 1976, the mother again contacted the Department, seeking placement of Crystal and of her second child, Angela, who had been born the previous January. This time the Department declined to arrange foster care, however, on the grounds that the children needed greater stability in their lives and should no longer be shuttled between foster homes and their mother's custody.

Approximately one month later, in September, 1976, a neighbor reported that the mother had left the children—then age four years, and eight months, respectively—alone overnight. As a result of this incident, the Department petitioned for protective custody pursuant to 22 M.R.S.A. § 3792 (1980). Pursuant to an *ex parte* order of care pending hearing issued by the District Court, the children were subsequently transferred to the Department's custody with their mother's consent. Approximately one year later, in August, 1977, the Department sent the children home to live with their mother who had by then established a relationship with a man whom the Department believed would be a responsible and effective father figure for the children.

During the period from August, 1977 to May, 1978, while the children were in her custody, the mother's situation gradually deteriorated. The Department's foster care worker assigned to monitor the family testified that the mother exhibited increasingly unstable behavior such as "running out at night with various men, getting drunk," keeping the children up late and frequently causing the older one to miss school. Finally, on May 28, 1978, the mother moved out of the home, leaving the children in the custody of her boyfriend.

On August 4, 1978, after a hearing on the Department's petition, the District Court issued a final order awarding protective custody of both children to the Department[1] and granting reasonable rights of visitation to the mother under the Department's supervision. The mother thereupon left the state to go to New York, and the children were transferred from the boyfriend's custody to another foster home on September 17, 1978. They have remained in foster care ever since.

A Department staff member testified at the termination hearing that immediately after the custody order was issued she had several telephone conversations with the mother concerning the proper care of her children and the changes that would be required for her to regain custody. However, all communication between the Department and the mother ceased sometime in August, 1979. Although the mother returned to Maine for an extended period in the summer of 1979, and again from June to December, 1980, she made no effort to contact either the children or the Department. She never exercised her visitation rights and her only contact with the children consisted of sending them cards and gifts on two occasions.

In February, 1981—two and one half years after entry of the protective custody order—when another staff member wrote to the mother to inquire about her then circumstances in preparation for what the Department referred to as a "termination summary," the mother replied that she had a stable home and wished to regain custody of the children. The staff member then called the mother to discuss the Department's concerns regarding return of the children. On March 20, 1981, the Department sent a letter outlining a "return home plan" requiring her (1) to provide funds for child support to the Department, (2) to undergo a complete psychiatric evaluation, and (3) to attend a meeting with her then boyfriend of three years and the Depart-

---

1. 22 M.R.S.A. § 3792, repealed by P.L.1979, ch. 733 § 15 (effective July 3, 1980), authorizes issuance of such an order upon a finding that the children are "living in circumstances which are seriously jeopardizing the[ir] health, welfare or morals."

ment staff at their Portland office. As a final step, the Department would initiate an interstate compact with New York officials to perform a study of the mother's home in Brooklyn. Although the mother did attend the meeting on April 22, 1981, she did not bring her boyfriend. As of that date, she had not supplied the Department with any child support payments, nor had she made any arrangements for the psychiatric examination. As a result of her failure to comply with the first three conditions of the reunification plan, the Department never initiated a home study.

Less than one week after the meeting, the Department petitioned for termination of the parental rights to both children. After hearing, the District Court issued an order of termination on December 1, 1981.[2]

On appeal, the mother correctly points out that from the time the protective custody order was entered in August, 1978, until February 27, 1981 when she received a letter in preparation for a "termination summary," the Department took no affirmative steps to facilitate reunification of the family. The record does not reflect any attempt by the Department to contact the mother during this period or to offer services to help her overcome the problems that had led to removal of the children from her custody. The failure to make such an effort is contrary to both the letter and the spirit of 22 M.R.S.A. § 4041.[3]

■ The Department's failure to fulfill its obligations under section 4041 does not, by itself, constitute a ground for denying a petition for termination of parental rights. *In re Daniel C.*, 480 A.2d 766 (Me.1984). Instead, the Department's efforts, or lack thereof, are a factor to be considered in evaluating the parents' conduct to determine whether there is clear and convincing evidence to support an order of termination under section 4055. *Id.* at 11.

■ In the instant case, as in *Daniel C.*, the mother made little or no effort to maintain contact with her children after the State had obtained protective custody. The Department did not offer any services to assist the mother, but it also did nothing affirmatively to obstruct development of a meaningful parent-child relationship. In contrast to *Daniel C.*, however, there is no indication on this record that the Department either withheld information from the mother concerning her children's whereabouts or in any way prevented her from exercising the visitation rights granted her by the District Court. Finally, although the mother did indicate a desire to regain custody of the children when the Department contacted her in February, 1981, she made little effort to accomplish that objective.[4]

Previous efforts by the Department to return the children to their mother's custo-

**2.** In its order the District Court found that the mother "is unwilling and unable to protect the children from jeopardy, has willfully abandoned the children, and has refused to take responsibility for [them]." Only one of these findings is required pursuant to 22 M.R.S.A. § 4055(1)(B)(2)(a) (Supp.1983–1984). The court further concluded, as required by section 4055(1)(B)(2)(b) and (c), that "the circumstances of [the mother] are unlikely to change in a reasonable time [and] that termination is in the best interests of the children." The children's father, James S., had consented in writing to termination of his parental rights on November 17, 1981, and did not thereafter participate in these proceedings.

**3.** Section 4041 imposes an affirmative obligation on the Department to *"provide, arrange or coordinate services* to facilitate the rehabilitation and reunification of the parents and child"

before seeking termination of parental rights. In addition to keeping the parents informed of the child's place of residence, serious injuries and medical care, and providing ample opportunities for visitation, the Department's services *shall* include *"periodically reviewing with* the parents why the child was removed, what must occur for the child to be returned and the *services* which are *available to assist them."* 22 M.R.S.A. § 4041(1)(C) (Supp.1983–1984) (Emphasis added). Moreover, one of the express legislative goals of the Child and Family Services and Child Protection Act is to "[g]ive family rehabilitation and reunification priority as a means for protecting the welfare of children." 22 M.R.S.A. § 4003(3) (Supp.1983–1984).

**4.** Unlike *In re Shannon R.,* 461 A.2d 707 (Me. 1983), where the mother had complied with all aspects of the reunification plan except for the requirement that she enroll in a "parenting"

dy during the period from August, 1976 until August, 1978, while insufficient to discharge the Department's reunification obligation under 22 M.R.S.A. § 4041, nevertheless were properly considered by the District Court in evaluating whether the mother was capable of taking responsibility for the children and protecting them from jeopardy within the meaning of 22 M.R. S.A. § 4055(1)(B)(2)(a). This mother's pattern of neglect over a period of three years from the time the State took the children into protective custody, coupled with her failure to comply with the terms of the Department's reunification plan constitutes sufficient evidence of a clear and convincing quality to support the court's termination order. Clearly the Department should have made a more concerted and sincere effort to facilitate family reunification in this case, yet there is no indication in the record that further efforts would have had significant prospects of success. In these circumstances it was incumbent upon the mother to demonstrate to the Department, as well as to the District Court, that she had overcome her problems and was therefore capable of caring properly for the children. In the absence of any such showing, we conclude that the District Court did not err in determining that there was sufficient proof to warrant the termination of parental rights under section 4055.

 Turning to the last issue raised on appeal, we find no merit in the mother's contention that the standard of clear and convincing evidence as applied in this case [5] fails to satisfy the requirements of due process under the federal constitution as articulated by the United States Supreme Court in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The Supreme Court ruled in that case that because fundamental rights are at stake in a termination of parental rights proceeding, the facts must be assessed in light of the stricter evidentiary standard of clear and convincing evidence. However, the opinion does not necessarily require that "clear and convincing evidence" be defined as any intermediate standard of proof. *See generally Taylor v. State*, 481 A.2d 139 (Part V) (Me.1984). Indeed, we note in the Supreme Court's conclusion that the "determination of the precise burden equal to or greater than [the 'clear and convincing evidence'] standard is a matter of state law properly left to state legislatures and state courts." *Santosky v. Kramer*, 455 U.S. at 770, 102 S.Ct. at 1403. Moreover, our section 4055 is cited in the opinion as one of fourteen states' statutes that "have required 'clear and convincing evidence' *or its equivalent*" in termination proceedings. *Id.* at 750 n. 3, 102 S.Ct. at 1393 n. 3. Significantly, in the cause before us the District Court expressly applied the requirement of *Santosky*.

Accordingly, the entry is:

Judgment affirmed.

All concurring.

---

course, this mother fulfilled only one of the Department's conditions by attending a meeting with the Department staff.

**5.** The decisions in this cause below, as well as the briefing and oral argument before us, all came long before we overruled *Horner v. Flynn*, 334 A.2d 194, 199 (Me.1975), in our recent opinion of *Taylor v. State*, 481 A.2d 139 (Me.1984).