MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2017 ME 90
Docket:        Pen-16-519
Submitted
  On Briefs:   April 27, 2017
Decided:       May 9, 2017

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

# IN RE JESSE B.

HJELM, J.

[¶1]   The parents of Jesse B. appeal from a judgment of the District Court (Bangor, *Jordan, J.*) terminating their parental rights to Jesse pursuant to 22 M.R.S. § 4055(1)(A)(1)(a) and (B)(2) (2016).  Both parents challenge the sufficiency of the evidence to support the court's findings of parental unfitness, and the mother also challenges the court's discretionary determination of the child's best interest.  We affirm the judgment.

[¶2]   Contrary to the parents' contentions, there is competent evidence in the record to support the court's findings, by clear and convincing evidence, that the parents are unwilling or unable to protect the child from jeopardy or take responsibility for the child within a time reasonably calculated to meet the child's needs.  *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii); *In re Logan M.*, 2017 ME 23, ¶¶ 2-3, 155 A.3d 430.  That evidence, described in the court's thorough decision, included the following.

[¶3]   The child, who was nearly three years old at the time of the termination hearing, suffers from chronic, severe medical conditions causing a number of developmental delays.  His conditions include a missing corpus callosum—a band of nerve fibers that would normally connect the two halves of his brain—which diminishes some of his intellectual functions; an underdevelopment of the optic nerve that makes it difficult for him to learn language and may prevent him from reading; spastic quadriparesis, a type of cerebral palsy affecting both sides of his body, which results in muscle rigidity and impaired mobility; and an atrial septal defect, which is a hole between the upper two chambers of his heart.  He is also being monitored for hormonal and urological issues.

[¶4]  Because of his conditions, the child requires regular treatment and monitoring by a team of more than ten educational specialists and medical providers.  The child also requires an unusually high degree of competence and engagement by his caretakers, who must provide in-home treatment and accurately inform the child's specialists and providers about his progress.  The failure to ensure that the child attends close to 100 percent of his appointments would pose a serious risk that the child would regress and suffer additional medical issues, as demonstrated by the following:

- The child's developmental pediatrician testified that if the child does not receive consistent physical therapy his joints may become "frozen" in place, negatively affecting his mobility—a condition that could only be corrected with surgery, if at all; and that if the child does not "get regular care" his doctors "may miss some medical complications that could certainly impair [his] quality of life" and that his development "would at best plateau" and may decline.

- The child's speech therapist testified that if the child does not consistently attend appointments there would be "safety concerns" because the child might be unable to comprehend verbal warnings about dangerous situations.

- The child's neurologist testified that the failure to follow through with the child's speech therapy could cause him to become frustrated and aggressive due to challenges with communication, and that the frustration could become so severe that he might need to be sedated with an anti-psychotic medication.

- The child's pediatric endocrinologist testified that if the child's hormone levels are not regularly monitored they may become imbalanced to a degree that could be fatal.

[¶5] Despite receiving information about the child's appointment schedule and the crucial importance that he receive consistent treatment, the parents attended only approximately 50-60 percent of the child's appointments during the pendency of these proceedings. In February 2016, more than two years after the child had been placed in foster care, the father told a psychologist that he had "no clue" about the child's appointment schedule because the mother usually kept track of it. There was evidence that when the parents did attend medical appointments they were actively

engaged and asked appropriate questions. As the trial court found, however, the parents' overall 50-60 percent attendance rate was grossly inadequate given the child's severe health issues. The parents' failure to reliably attend nearly all of the child's appointments was sufficient, standing alone, to support the court's ultimate finding of two grounds of parental unfitness. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii); *In re I.R.*, 2015 ME 93, ¶ 11, 120 A.3d 119.

[¶6] The court's finding of parental unfitness was further supported by evidence that both parents use marijuana at least once a day to cope with anxiety and depression, that they have no intention to modify their behavior and have not consistently engaged in therapy and substance abuse treatment, and that their marijuana use reduces their motivation and ability to attend to the child's substantial needs.

[¶7] As the father argues, his court ordered diagnostic evaluation did "not reflect a formal substance abuse diagnosis," but that evaluation also states that the father has "chronic and pervasive" mental health and substance abuse problems that "limit his ability to mobilize motivation to change," "perceive and understand reunification goals," and "integrate information." The psychologist who administered the evaluation testified that the father's substance abuse issues pose a serious risk to the child, in part because

marijuana "affects motivation," impairs cognition, and diminishes a person's ability to "focus[] and stay[] on track." Finally, a licensed clinical social worker's 2013 assessment of the father stated that the father relied on marijuana to "self-medicate" and recommended substance abuse treatment, which the father never completed.

[¶8]  Based on this evidence, the court did not err by finding that the parents' marijuana use had an adverse effect on their ability to care for the child and was therefore a factor supporting the termination of their parental rights.  *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii); *In re Logan M.*, 2017 ME 23, ¶ 3, 155 A.3d 430.

[¶9]  The child has made hard-earned developmental gains since being placed in foster care, largely because of the foster parents' diligence and dedication to the child's treatment.  The child's foster parents wish to adopt him.

[¶10]  In sum, although it is clear that the parents love the child, given the child's extraordinary medical needs and the parents' failure to reliably meet those needs, the court did not err by determining that the parents were unwilling or unable to take responsibility for the child or to protect him from jeopardy within a time reasonably calculated to meet his needs.  *See* 22 M.R.S.

§ 4055(1)(B)(2)(b)(i)-(ii); *In re I.R.*, 2015 ME 93, ¶ 11, 120 A.3d 119; *In re A.H.*, 2013 ME 85, ¶ 15, 77 A.3d 1012. The court also did not err or abuse its discretion by determining that the best interest of the child is to be placed in a permanent, adoptive home where he will receive the type of "consistent, thoughtful and loving care being provided by his current placement." *See* 22 M.R.S. § 4055(1)(B)(2)(a); *In re Logan M.*, 2017 ME 23, ¶ 5, 155 A.3d 430; *In re I.R.*, 2015 ME 93, ¶ 11, 120 A.3d 119.

The entry is:

Judgment affirmed.

---

Aaron M. Frey, Esq., Bangor, for appellant father

Christopher D. Smith, Esq., Law Office of Christopher D. Smith, Esq., Dexter, for appellant mother

Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Bangor District Court docket number PC-2013-122
FOR CLERK REFERENCE ONLY