MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 16
Docket:        And-23-100
Argued:        September 13, 2023
Decided:       January 31, 2024

Panel:         STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

# IN RE CHILD OF BARNI A.

JABAR, J.

[¶1]  Barni A. appeals from an order of the District Court (Lewiston, *S. Driscoll, J.*) terminating her parental rights to her older child.  She contends that the State of Maine's failure to provide her child with 24/7 private nursing care that he is legally entitled to receive under Maine's Medicaid Program, MaineCare, resulted in the trial court erroneously finding that she is unfit because she could not address her child's complicated medical needs.[1]

[¶2]  Because the trial court's findings do not address important issues that must be answered before we can determine whether the record supports a finding by clear and convincing evidence that the mother is unfit, we vacate the judgment and remand the matter to the trial court.

---

[1]  Briefs of amici curiae were submitted by Disability Rights Maine, the American Civil Liberties Union, and the American Civil Liberties Union of Maine; the Maine Parental Rights Attorneys Association; and the Civil Rights Corps.

## I.  BACKGROUND

### A.    Procedural History

[¶3]  On July 16, 2019, the Department of Health and Human Services filed a petition for a child protection order and a request for a preliminary child protection order as to the child at issue here and the child's younger brother. The District Court (*Oram, C.J.*) granted an order of preliminary child protection the same day.  The petition involved both parents, but the father of the children died unexpectedly only days later.  On July 31, 2019, the court (*Martin, J.*) held a summary preliminary hearing at which the mother appeared and waived her right to a hearing.

[¶4]  Jeopardy was found against the mother as to both children on October 9, 2019, due to the threat of serious physical harm and deprivation of adequate care and shelter.  The court (*Dow, J.*) found that the mother had failed to ensure that she consistently met the children's medical needs, had not been able to parent the children in a consistent and predictable manner, and did not have safe and appropriate housing.  The court ordered the mother to, inter alia, engage in a court ordered diagnostic evaluation (CODE), engage in a mental health assessment, consistently attend the children's medical appointments,

maintain stable housing, and participate actively and consistently in mental health services.

[¶5] Following the jeopardy order, the court held regular judicial review hearings. On June 22, 2021, the court (*S. Driscoll, J.*) entered a judicial review and permanency planning order finding that the mother had engaged in the mental health treatment required by the jeopardy order and had made progress in her treatment. The court also found that the mother had demonstrated, over the course of a trial home placement that had begun in March 2021, an ability to meet the younger brother's needs. Based on those findings, the Department moved to dismiss the younger brother from the child protection proceeding, and on September 28, 2021, the court granted the motion. The mother has retained custody of the younger brother since that time.

[¶6] A week after the younger brother was dismissed, the Department filed a petition to terminate the mother's parental rights as to the older child. The court held a three-day hearing on the petition that concluded on February 1, 2023. On March 1, 2023, the court entered its judgment terminating the mother's parental rights to the child. The court found that the mother is unfit because (1) she is unable to protect the child from jeopardy and

4

these circumstances are unlikely to change within a time reasonably calculated to meet the child's needs and (2) she is unable to take responsibility for the child within a time reasonably calculated to meet the child's needs. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii) (2023).[2]   The court further found that terminating the mother's parental rights was in the best interest of the child. *See id.* § 4055(1)(B)(2)(a).  The mother timely appealed. *See* M.R. App. P. 2B(c).

**B.    Facts**

[¶7]  The mother is the biological mother of both children.  The older child was born premature and with a genetic abnormality that causes a range of medical challenges.  Tumors on his brain cause seizures and affect his executive functioning, vision, and visual processing.  The tumors will likely grow and change over time and, if they grow aggressively, could become malignant or impact brain function.  The child is predisposed to neurological, cognitive, kidney, feeding, skin, and breathing issues, as well as learning and intellectual disabilities.  He is unable to chew or swallow due to impaired neurological functioning.  His food must be mixed and administered in measured doses through a gastronomy tube (g-tube) into his stomach, after

---

[2]   Under 22 M.R.S. § 4055(1)(B)(2)(b), a court may find that a parent is unfit when the parent is either unable or unwilling to eliminate jeopardy or to take responsibility for the child.  Here, the court expressly found that the mother is unfit based on her lack of *ability* and not on her lack of *will*.

which he must be vented, a process that manipulates his stomach to push up air to minimize painful abdominal distension and vomiting. The child receives numerous medications through both the g-tube and, at times, a nebulizer. He receives speech, occupational, and physical therapy to assist with sitting, standing, and muscle development.

[¶8] To manage his condition, the child has a cohort of care providers, including a neurologist; a primary care physician; a nutritionist; a nephrologist; a pulmonologist; a urologist; an oncologist; an ear, nose, and throat specialist; a gastroenterologist; an eye specialist; an occupational therapist; a physical therapist; a speech therapist; a teacher for the visually impaired; and a developmental pediatrician. The child has significant long-term medical needs, and it is not known whether his condition will improve or worsen over time.

[¶9] Although his condition is not acutely life threatening, the child must be monitored constantly and vigilantly for behavioral cues due to his inability to communicate verbally, lest otherwise-treatable issues be missed. He must be surveilled for subtle seizure activity, visual disturbances, twitching, urination and defecation, changes in breathing, and changes to his skin—all symptoms that could necessitate medical attention.

6

[¶10]   According to his many caregivers, the child qualifies for 24/7 private nursing care under Maine's Medicaid program, MaineCare.  *See* 22 M.R.S. §§ 3172-3196 (2023); 10-144 C.M.R. ch. 101, ch. II §§ 94 (effective May 1, 2010); 10-144 C.M.R. ch. 101, ch. II § 96 (effective Feb. 11, 2019); 42 U.S.C.A. §§ 1396 to 1396w-7 (Westlaw through Pub. L. No. 118-30).  He receives skilled nursing care in his resource home only on weekdays and never overnight.  He has never received the 24/7 private nursing care that he legally qualifies for, either in the resource home or in the mother's home.

[¶11]  The mother has made great progress since the commencement of this child protection proceeding and has alleviated the jeopardy caused by her housing and mental health issues to such an extent that she successfully reunified with the child's younger brother.

[¶12]  Under the care of his resource family, the child has progressed. The resource mother has provided him extraordinary care.  She is extremely knowledgeable about his condition, capably coordinates his care and providers, and can provide emergency response including transportation.  The resource family can also care for and attend to the child at all hours.  The child has been in this placement for most of his life, and he has bonded with his resource family.

## II. DISCUSSION

### A.    Legal Standard

[¶13]  "To terminate parental rights, a trial court must first find one of the four statutory bases of parental unfitness in 22 M.R.S. § 4055(1)(B)(2)(b), and then it must consider the best interest of the child."  *In re Child of Christine M.*, 2018 ME 133, ¶ 6, 194 A.3d 390.  Unfitness may be based on any one of the following:

> (i)     The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs;
>
> (ii)    The parent has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs;
>
> (iii)   The child has been abandoned; or
>
> (iv)   The parent has failed to make a good faith effort to rehabilitate and reunify with the child pursuant to section 4041.

22 M.R.S. § 4055(1)(B)(2)(b).  Unless the court first finds by clear and convincing evidence that the parent is unfit, it cannot reach the issue of whether termination of parental rights is in the child's best interest.  *See Adoption by Stefan S.*, 2020 ME 5, ¶ 8, 223 A.3d 468.

8

[¶14]  We review a court's factual findings of parental unfitness and best interest of the child for clear error and its ultimate decision on termination for an abuse of discretion.  *Id.* ¶ 10.  "When the burden of proof at trial is clear and convincing evidence, our review is to determine whether the fact-finder could reasonably have been persuaded that the required findings were proved to be highly probable."  *Id.* (quotation marks omitted).

[¶15]  On appeal, the mother and amici contend that we must examine this case in the context of the mother's constitutional right to provide for her child.  *See generally Santosky v. Kramer*, 455 U.S. 745 (1982).  They urge us to go beyond the clear-and-convincing-evidence standard and determine whether termination of the mother's parental rights, based on a finding that she is unfit due to her inability to resolve jeopardy and take responsibility for the child and his complicated medical needs, was the least restrictive means to achieve a compelling government interest, *see Hiller v. Fausey*, 904 A.2d 875, 885-86 (Pa. 2006), given that the State has failed to provide 24/7 private nursing care to the child that could enable the mother to care for him.

[¶16] We agree that we must review this case with regard to the mother's constitutional right to parent her child.  We note, however, that Maine's statute

regarding the termination of parental rights presently contains sufficient safeguards to protect a parent's constitutional rights. We have stated that

> [t]he Supreme Court of the United States has concluded that requiring proof by clear and convincing evidence in termination of parental rights proceedings satisfies the Constitution because it "adequately conveys to the factfinder the level of subjective certainty about [the] factual conclusions necessary to satisfy due process."

*In re Child of Shayla S.*, 2019 ME 68, ¶ 7, 207 A.3d 1207 (second alteration in original) (quoting *Santosky*, 455 U.S. at 769). We have repeatedly asserted that the standard of proof of clear and convincing evidence is constitutionally sufficient in termination of parental rights cases. *E.g.*, *In re Crystal S.*, 483 A.2d 1210, 1213 (Me. 1984); *Guardianship of Chamberlain*, 2015 ME 76, ¶ 23, 118 A.3d 229. We therefore review the trial court's judgment to determine whether clear and convincing evidence supports the court's finding that the mother is unfit and its decision to terminate the parental rights of the mother.

## B.    Parental Unfitness

[¶17] The trial court found the mother unfit under two statutory criteria: inability to protect the child from jeopardy and inability to take responsibility for the child in a time reasonably calculated to meet the child's needs. 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii). These findings were based on the trial court's observations that the mother "is unable to consistently meet [the child's]

heightened medical needs" and "has not yet demonstrated an ability to care for [him] full time in her home even with the available nursing assistance."

[¶18] The mother now challenges the trial court's conclusion that, because she is unable to address the child's complicated medical problems without assistance, she is an unfit parent for him. She contends that if the State provided the nursing care and other services that she and the child are legally entitled to receive, she would be able to meet his medical needs. The mother asserts that because the unavailability of adequate private nursing care and her inability to care for the child on her own were the primary reasons for the court's unfitness finding, the court erred when it concluded by clear and convincing evidence that she is unfit under 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii).

[¶19] We agree. The child has severe medical needs that entitle him to full-time private nursing care under federal and state law. The Department never provided that care, and its reunification and rehabilitation plan did not afford the mother any opportunity to demonstrate that, with the medical services the child is entitled to receive, she is able to care for the child. Absent evidence that the mother—not on her own but with the benefit of 24/7 private nursing care—is unable to alleviate jeopardy or take responsibility for the child, the record was not sufficient to find by clear and convincing evidence that

the mother is unfit. Furthermore, although the court noted that the mother's personal challenges impeded reunification, her significant progress dealing with those challenges throughout this child protection proceeding undermines the court's unfitness finding.

### 1. Full-Time Nursing Care and Reunification Efforts

[¶20] We have held that the extraordinary medical needs of a child, coupled with a parent's failure to meet those needs, is sufficient to support a finding that the parent is unable to protect the child from jeopardy or take responsibility for the child within a time reasonably calculated to meet the child's needs. *See In re Jesse B.*, 2017 ME 90, ¶¶ 3-5, 10, 160 A.3d 1187; *In re A.H.*, 2013 ME 85, ¶¶ 2-7, 15, 77 A.3d 1012. In *In re Jesse B.*, we affirmed the termination of the parents' parental rights where the child had substantial medical needs and the parents failed to engage in services that would allow them to meet their child's needs. 2017 ME 90, ¶¶ 3-5, 10, 160 A.3d 1187. Also, in *In re A.H.*, we held that, "[g]iven the evidence that the[] parents, however loving, [would] never have the capacity to adequately care for th[e] child with her significant medical needs, the court could reasonably have been persuaded that it was highly probable that the parents were unable to protect the child from jeopardy to her health or welfare and were unable to take responsibility

12

for her within a time reasonably calculated to meet her needs."  2013 ME 85, ¶ 15, 77 A.3d 1012.

[¶21]  Those cases do not compel terminating the mother's parental rights here.  Unlike the present matter, neither case involved a situation in which the child was legally entitled to 24/7 private nursing services to manage his medical needs and the State failed to facilitate that care.  The case before us is unique because the child qualifies for around-the-clock private nursing care under the federal Medicaid Act and MaineCare.  *See* 42 U.S.C.A. §§ 1396 to 1396w-7; 22 M.R.S. §§ 3172-3196; 10-144 C.M.R. ch. 101, ch. II §§ 94 (effective May 1, 2010); 10-144 C.M.R. ch. 101, ch. II, § 96 (effective Feb. 11, 2019).  Medicaid requires states to promptly provide or arrange for treatment necessary to correct or ameliorate a medical condition once screening and assessment have occurred and the child's medically necessary services have been identified.[3]  42 U.S.C.A. §§ 1396a(a)(10)(A), (43)(C), 1396d(a)(4)(B), (8),

---

[3] Although the federal Medicaid Act often requires states only to pay for medical services, when the Act was amended in 2010, states became responsible for providing the services themselves in some instances.  *O.B. v. Norwood*, 838 F.3d 837, 843 (7th Cir. 2016) ("[W]here the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them." (quotation marks omitted)); Patient Protection & Affordable Care Act, Pub. L. No. 111-148, § 2304, 124 Stat. 119, 296 (2010).  The Seventh and the Ninth Circuit Courts of Appeals have held that the obligation to provide, or arrange for the provision of, medical services extends to private duty nursing services for children under the early and periodic screening, diagnostic, and treatment provisions of the Medicaid Act.  *O.B.*, 838 F.3d at 841-43 (holding that state was required to arrange for provision of home nursing services for qualified children when state

(r)(5).  These services include private-duty nursing services.  *Id.* § 1396d(a)(8); *supra* n.3.  Under MaineCare, the child is eligible for Level IV Private Duty Nursing, which includes residential care.  10-144 C.M.R. ch. 101 § 96.01-3, 96.02-4(D) (effective Feb. 11, 2019).[4]

[¶22]  The Department, which administers MaineCare, has never provided the child with this level of care.[5]  The record contains vague references to nursing shortages and problems surrounding the COVID-19 pandemic, but there is nothing indicating that the Department made any attempt to secure 24/7 nursing care, or anything close to it, for the child.  Nor did the mother's

---

failed to argue that nursing shortage may interfere with Medicaid obligations); *Katie A. ex rel. Ludin v. Los Angeles Cnty.*, 481 F.3d 1150, 1154 (9th Cir. 2007); 42 U.S.C.A. § 1396d(r)(5).

Even if the Department here is required only to provide reimbursement for the child's necessary medical services, it is still the Department that sets the rates that directly impact service capacity, and it is still the Department that manages the system and arranges the provision of these services by other entities.  The record does not address the Department's unique role to provide reunification services under the child protection statute on one hand and its role as the gatekeeper of Title 42 benefits to provide services to qualified individuals on the other.

[4] Alternatively, the child is eligible for all medically necessary treatment services covered by 42 U.S.C. § 1396(a) and (r) under the early and periodic screening, diagnostic, and treatment regulations of MaineCare.  10-144 C.M.R. § 94.02, 94.05-2 (effective May 1, 2010).

[5] Relatedly, the U.S. Department of Justice has documented in detail the Department's failure to provide sufficient community-based services to children with long-term behavioral and developmental disabilities.  *See* Letter from Kristen Clarke, Assistant Att'y Gen., C.R. Div., U.S. Dep't of Just., to Gov. Janet Mills & Att'y Gen. Aaron Frey (June 22, 2022), https://www.justice.gov/opa/press-release/file/1514326/download [https://perma.cc/9AGG-LDXE].  This failure violates Subpart A of Title II of the Americans with Disabilities Act, which prohibits states from discriminating based on disability.  *See id.*; 42 U.S.C.A. §§ 12131-12134 (Westlaw through Pub. L. No. 118-30); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).

attorney or the guardian ad litem (GAL) seek to compel the provision of adequate care. Rather, the most the child received was sixty hours per week of nursing care, provided only on weekdays. Because of this failure, the mother has never been afforded the assistance necessary to care for her child.

[¶23] Moreover, the Department's reunification and rehabilitation efforts failed to adequately address the child's medical needs and provide the services that would create any possibility of the mother reunifying with the child. In a child protection proceeding, the Department must develop a reunification plan that includes "changes . . . necessary to eliminate jeopardy to the child while in the care of a parent" and must "[m]ake good faith efforts to cooperate with the parent in the pursuit of the plan." 22 M.R.S. § 4041(1-A)(A)(1)(c)(ii), (3) (2023). "The rehabilitation and reunification plan is the roadmap by which the Department and a parent are expected to cooperatively seek to rehabilitate the conditions that resulted in jeopardy to the child." *In re Child of Rebecca J.*, 2019 ME 119, ¶ 6, 213 A.3d 108 (quotation marks omitted). The Department and the parent share the obligation to reunify. *In re Thomas D.,* 2004 ME 104, ¶ 23, 854 A.2d 195.

[¶24] Although the Department filed rehabilitation and reunification plans pursuant to section 4041(1-A), the plans failed to afford the mother

opportunities for home visits with sufficient nursing care or resources in place to assist her in alleviating jeopardy.

[¶25] After the jeopardy order was entered and the Department prepared its first reunification plan in March 2020, the court held regular judicial review hearings addressing reunification efforts, but the mother's visitation time with the child was substantially limited throughout the case. A judicial review order dated June 22, 2021, indicated that visits between the mother and her child had been suspended prior to the COVID-19 pandemic, because of the mother's difficulty early in the proceeding meeting the child's needs, and were never restarted because of the pandemic. Then, a judicial review order dated October 28, 2021—after the Department filed the petition to terminate the mother's parental rights—indicated that although supervised visits between the mother and child had resumed on June 25, 2021, they were again suspended only a month later due to a lack of nursing staff. A judicial review order dated March 17, 2022, indicated that there was "inconsistency in visitation due to the lack of available nursing staff." And a judicial review order dated August 11, 2022, again indicated that between late March 2020 and May 2022, a period of over two years, visitation between the mother and the child had been limited due to lack of available nursing staff. The Department's

16

second reunification plan, filed on September 8, 2022, stated that supervised visitation was occurring only on Monday afternoons and Thursday mornings for one and a half hours each.

[¶26] Since the child has been in the custody of the resource parents and visitation was severely curtailed due to the COVID-19 pandemic, the mother has never had the opportunity to demonstrate her ability to care for the child with increased nursing care. The GAL testified that she has never observed the child with the mother in the mother's home, therefore precluding any opportunity to comment on the mother's ability to care for the child, with or without the requisite nursing care. And, as noted above, although the child qualifies for full-time nursing care, the most he ever received was sixty hours per week on weekdays.

[¶27] The September 8, 2022, reunification plan indicated that the mother "would most likely require full-time or nearly full-time support to provide adequate, safe care-taking to [the child]." But the plan failed to mention that the child legally qualifies for 24/7 nursing care under MaineCare. Further, in discussing how to measure the mother's progress toward eliminating jeopardy, the plan indicated that reunification would "include an ability [for the mother] to care for [her child] by herself and recognize when and with whom

to seek professional medical care." In light of the medical needs of the child that are part of the record, the Department's benchmark of "an ability [for the mother] to care for [her child] by herself" was virtually impossible for the mother to meet.[6]

[¶28]  It was repeatedly stated throughout the child protection proceeding that, although the child was entitled to 24/7 private nursing care, there were inadequate resources to meet his needs.  Inadequate resources do not excuse a state's obligation to provide benefits under Medicaid.  *See, e.g.*, *Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 388, 396 (5th Cir. 1980) (holding that state health department's failure to obtain sufficient funds to cover Medicaid expenditures did not preclude eligible providers from receiving reasonable cost reimbursement); *Doe v. Chiles*, 136 F.3d 709, 721-722 (11th Cir. 1998).

[¶29]  In this case, there is nothing on the record explaining why there were inadequate resources for this child, nor is there evidence of any advocacy on behalf of the child or the mother by the Department, the GAL, or the mother's

---

[6] The September 8, 2022, reunification plan, filed only three months before the scheduled hearing on the Department's petition for termination of parental rights, was totally unrealistic given the child's extensive medical needs and was not a good faith effort to effectuate reunification.  *See* 22 M.R.S. § 4041(1-A)(A) (2023).  We acknowledge, however, that the mother has not challenged the sufficiency of the Department's reunification efforts.  Nonetheless, whether the record contains sufficient evidence to find that the mother is unfit to care for her medically needy child is squarely before us, and that question requires us to determine whether the mother was afforded adequate opportunities under appropriate circumstances to demonstrate her ability to care for her child.

attorney. In its pursuit of reunification, the Department never provided the child with the services that he is entitled to receive, even though sufficient nursing care for the child may have enabled the mother to eliminate jeopardy and take responsibility for him.

[¶30] The trial court concluded that the *mother's* inability to meet the child's significant medical needs was why she had not alleviated jeopardy, and that, although she had made progress in developing the skills necessary to care for the child, she had not demonstrated the ability to do so full-time with the available nursing assistance. The trial court did not, however, make any findings as to whether she would have been able to alleviate jeopardy had the *Department* met its obligation under federal and state law to provide the full-time medical care to which the child is entitled. In contrast to our prior caselaw concerning the termination of parental rights of parents with medically compromised children, the trial court's findings in this case indicate that it was the mother's inability, without legally mandated assistance, to provide the necessary medical care for her child's complicated health problems that led to the trial court's conclusion that she is unfit.

[¶31] The mother's inability to care for the child full-time with the assistance presently available may not be a problem if the mother is provided

the nursing care her child is legally entitled to receive. The court did not address the mother's fitness if the requisite nursing care were available. The need for her to acquire the skills necessary to care for the child would have been greatly diminished had she had the nursing support to which the child was legally entitled. Furthermore, the record clearly shows that the mother was not afforded a realistic opportunity to meet the child's medical needs because the mother's visits with the child were severely limited due to the COVID-19 pandemic and lack of nursing resources. Therefore, we cannot conclude on this record that a reasonable fact finder could be persuaded that it was highly probable that the mother is unfit.

### 2. Mother's Personal Challenges

[¶32] The evidence presented at the termination hearing further demonstrates that the unfitness finding was based only on the mother's difficulty managing the child's complex medical condition and that, in all other respects, the mother made significant progress following the initial jeopardy determination. The trial court found that the mother's own behavioral challenges and difficulties learning how to administer the child's medical care "impede her ability to work with the constellation of providers who must rely on [the child's] primary caregiver to monitor and report symptoms and seek

appropriate care, including emergency care if necessary." The court also found that the mother's intellectual and mental health challenges have "impeded her progress towards reunification."

[¶33] The evidence does not support this finding by clear and convincing evidence. The mother has made significant progress in dealing with her behavioral challenges and, because of the limited, understaffed visitation time she was afforded, she never had the opportunity to demonstrate that she had resolved any personal impediments to her ability to care for the child.

[¶34] A Department caseworker acknowledged that the mother had alleviated many of the original bases for jeopardy and had done everything that the Department had asked her to do in pursuit of reunification. The caseworker testified that the only remaining basis for jeopardy was the inability to meet the child's medical needs. Moreover, in her reports, the GAL focused on the child's medical needs, stating that there were "significant concerns about [the mother's] ability to manage his fragile medical condition" and that the mother "has not demonstrated the ability to effectively care for her significant medically compromised child." This opinion by the GAL was given even though she never observed the mother and child together at the mother's home.

[¶35] One of the child's nurses testified that the mother is "very attentive to [the child], very loving, and tries to be interactive with him" as much as possible. A nurse who attended visits between the mother and the child testified that, after training, the mother was able to independently feed the child and mix and administer his medications. It is clear that the mother made progress despite the limited number of visitations with the child and a nurse.

[¶36] A licensed clinical professional counselor who began counseling the mother nearly three years prior to the termination hearing acknowledged that any parent would be overwhelmed by the situation the mother faced—a sick child, the death of her husband, and an ongoing pandemic crisis—and that because of those circumstances the mother never had a full opportunity to learn the child's medical needs and meet them. He believed that the mother was doing well and testified that he had seen a significant improvement in her behavior over time. He commented on the mother's February 2020 CODE evaluation, which indicated that the mother had some intellectual difficulties. He stated that during the two years and nine months that he counselled her following the CODE evaluation he did not see any actual intellectual disability.[7]

---

[7] The CODE evaluation raised the question of whether the mother is disabled and entitled to receive resources to assist her in caring for her child. The CODE report flagged concerns about the mother's cognitive function and raised a possible diagnosis of intellectual disability. Despite these

[¶37]  The counselor's observation that the mother's behavior had improved since the removal of her children and death of her husband is consistent with the Department's observations as the proceedings progressed. The Department acknowledged in its September 2022 reunification plan that the mother had secured stable housing with space for both of her children and the medical equipment for the older child, expanded her network of support for transportation to appointments and visitations, attended every visitation and appointment after they resumed in May 2022, and "put[] forth full effort to learn how to care for" the child and "maintain[] her personal health."  Most significantly, the Department believed that the mother had alleviated any jeopardy regarding the child's younger brother and withdrew its petition to terminate the mother's parental rights regarding him.

[¶38]  It is clear that the court's conclusion regarding the mother's unfitness focused on the mother's inability to deal with her child's complicated

---

results, the Department never followed up to determine whether the mother has an intellectual disability.  Had the Department inquired further and obtained a diagnosis of intellectual disability, the Department might have owed obligations not only to provide medical services to the child, *supra* §§ 20-31, but also to provide services to the mother to manage the child's needs in pursuit of rehabilitation and reunification.  *See* 22 M.R.S. § 4041(1-A)(A)(1)(c)(iv).  So, regardless of whether the mother has an intellectual disability, the record does not support the unfitness finding.  On one hand, if the mother has an intellectual disability, the Department did not meet its reunification obligation to provide rehabilitative services that would have allowed the mother to care for the child. On the other hand, if the mother does not have an intellectual disability, the Department still failed to provide sufficient opportunities after the mother had made progress in her personal challenges to determine whether she is an unfit parent when the services that the child needs are in place.

medical condition on her own. Given the mother's significant progress in overcoming her personal challenges, and the fact that the mother was permitted only limited opportunities to demonstrate her ability to care for the child with adequate nursing care in place after making that progress, we question whether the court's finding of unfitness meets the "clear and convincing" standard.

[¶39] We must review this case within the constitutional framework imposing a heightened burden to prove parental unfitness by clear and convincing evidence. To conclude that the record establishes a high probability that the mother is unable to take responsibility for her child or alleviate jeopardy because she cannot manage the child's extraordinary medical needs without support, when the Department has a legal duty to provide that support, would undermine the mother's fundamental constitutional right to the care, custody, and control of her child and render meaningless the procedural safeguards, including the heightened evidentiary burden, erected to protect that interest. *See generally In re Guardianship of Chamberlain*, 2015 ME 76, ¶¶ 20-24, 118 A.3d 229 (noting the constitutional significance of the heightened standard of proof required to terminate parental rights); 22 M.R.S. § 4041 (imposing reunification duties upon both the Department and the

parent); 22 M.R.S. § 4005 (2023) (providing a right to legal representation in proceedings for termination of parental rights); 22 M.R.S. § 4038(1) (2023) (mandating judicial review of jeopardy findings).

[¶40] The Department should have offered 24/7 skilled nursing care for the child as part of its reunification plan, and its failure to do so is a violation of its reunification responsibility as well as its MaineCare obligation. *See* 22 M.R.S. § 4041(1-A). The Department's "rehabilitation and reunification plan is the centerpiece of child protective proceedings following a jeopardy determination." *In re Thomas D.*, 2004 ME 104, ¶ 26, 854 A.2d 195. Although the Department's failure to "provide adequate rehabilitation and reunification services" or "complete a rehabilitation and reunification plan" is not alone a "basis to deny a petition to terminate parental rights," it is an "important factor that must be carefully evaluated" when determining parental unfitness based on a parent's failure to achieve benchmarks for reunification set by the Department. *Id* ¶ 28. Even if the Department has failed to meet its reunification responsibility, a parent may still be deemed unfit. *See In re Doris G.,* 2006 ME 142, ¶¶ 15-16, 912 A.2d 572.

[¶41] But this case is different. We cannot assume that the mother would have been found unfit if the Department had met its legal obligations. The

significance of the Department's failure to provide the services that the child needs is elevated by the fact that the services are mandated by law. In fact, the record demonstrates that the Department's failure to meet its MaineCare obligations actually impeded the mother's visitations for extensive periods of time.

[¶42] The record does not, in the absence of a finding that the mother would be unfit even if the Department had met its legal duty, establish by clear and convincing evidence that the mother is unfit.

## C.     Best Interest of the Child

[¶43] Because we cannot conclude that there was sufficient evidence in the record to find the mother unfit by clear and convincing evidence, we do not reach the issue of whether termination of the mother's parental rights was in the child's best interest. Nonetheless, we take the opportunity to reiterate the trial court's alternatives when conducting a best interest analysis.

[¶44] Although not before us, it is important to note that in determining the best interest of the child and providing permanency for the child, termination of parental rights and adoption is not the only alternative. As we recently stated,

> [t]he Legislature has provided five different permanency options including adoption and permanency guardianship. A permanency

guardianship may be ordered to establish safe, long-term care for a child, but it is not appropriate when the child needs the certainty and stability of adoption and the parties otherwise need clarity in their respective roles. Unlike adoption, a permanency guardianship allows for a court to order that a parent have reasonable contact with the child where it is in the best interest[] of the child. If a trial court finds that a child needs permanency, then the trial court should not automatically conclude that terminating the parents' parental rights and adoption is the best way to effectuate permanency. The Legislature has determined that both adoption and permanency guardianships are equally available to further the goal of permanency for children, and courts should consider the particularities of what kind of permanency and stability a child needs before determining that adoption, rather than one of the other equally available options, is the best course. A finding that a child needs permanency cannot, without more, be enough to conclude that termination is in the best interest of the child because this would never allow a court to conclude that any other permanency option, including a permanency guardianship, would be in the best interest of the child.

. . . .

In sum, to ensure that terminating a parent's parental rights is in the best interest of the child, there must be some reason besides a general need for permanency that adoption is the best permanency option for that child. The risk of a generalized finding that permanency always requires adoption, and therefore termination of a parent's parental rights, is that a court might terminate a parent's parental rights when it is not in the best interest of a child and another, better permanency option exists.

*In re Children of Quincy A.*, 2023 ME 49, ¶¶ 22, 24, 300 A.3d 832 (cleaned up).

[¶45] The caseworker for the Department testified that she considered a permanency guardianship, but there is nothing in the record regarding any

follow up or advocacy for this option by the Department, the GAL, or the mother's attorney. Permanency guardianship in this case might have been a viable option and in the best interest of the child, without the need to terminate the mother's parental rights.

[¶46] The trial court found that it was in the child's best interest to remain with the resource family and that the child needed permanency and concluded that the permanency plan should be adoption. In this case, the mother's attorney did not appeal the trial court's conclusion regarding the child's best interest, nor did the mother's attorney file a motion for further findings on the issue of permanency, and therefore the issue of the best permanency plan for the child is not before us. *See* M.R. Civ. P. 52(b); *cf. In re Children of Quincy A.*, 2023 ME 49, ¶ 26, 300 A.3d 832. Still, because we vacate the judgment and remand the matter to the trial court, we note that a permanency guardianship may be an appropriate permanency plan under these circumstances.

### III. CONCLUSION

[¶47] We fully recognize that vacating the termination judgment does nothing by itself to rectify the Department's failure to fulfill its obligation to provide services, so we encourage the court, the mother, and the Department

to explore alternatives to termination that do not put the child at risk but that recognize the Department's obligation.

[¶48]  We remand the case to the trial court for further proceedings to consider the following: (1) whether the mother has an intellectual disability and, if she does, how it bears on both parental fitness and the Department's reunification obligation; (2) whether the mother is, or would be, unfit regardless of the Department's failure to meet its MaineCare obligation regarding skilled nursing care; and (3) whether there is an alternative to termination of the mother's parental rights that meets the best interest of the child.  On remand, the District Court may take further evidence.

The entry is:

> Judgment vacated.  Remanded to the District Court for further proceedings consistent with this opinion.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant mother

Aaron M. Frey, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen. (orally), Office of the Attorney General, Bangor, for appellee Department of Health and Human Services

Jeremy Pratt, Esq., Pratt & Simmons, P.A., Camden, and Sumayya Saleh, Esq., Civil Rights Corps, Washington D.C., for amicus curiae Civil Rights Corps

Julian Richter, Esq., Bath, for amicus curiae Maine Parental Rights Attorneys Association

Lauren Wille, Esq., Disability Rights Maine, Augusta, for amicus curiae Disability Rights Maine

Carol Garvan, Esq., and Zachary L. Heiden, Esq., American Civil Liberties Union of Maine Foundation, Portland, and Zoe Brennan-Krohn, Esq., American Civil Liberties Union Foundation, San Francisco, California, for amici curiae American Civil Liberties Union and American Civil Liberties Union of Maine

Lewiston District Court docket number PC-2019-76